UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHRISTOPHER L. WIESMUELLER, | |
| Plaintiff, | Case No. 3:18-cv-01257 |
| v. | Judge William L. Campbell, Jr.<br>Magistrate Judge Alistair E. Newbern |
| CARY OLIVER, et al., | |
| Defendants. | |

To: The Honorable William L. Campbell, Jr., District Judge

## REPORT AND RECOMMENDATION

In August 2015, Defendants Cary and Charlene Oliver offered to help their daughter Defendant Corrine Wiesmueller and her husband Plaintiff Christopher L. Wiesmueller buy a house if they moved from their home in Wisconsin closer to the Olivers in Tennessee. The Wiesmuellers took the Olivers up on their offer and moved with their children (the Olivers' grandchildren) to a home that the Olivers purchased in Burns, Tennessee. The Wiesmuellers made monthly payments to the Olivers, which the Olivers applied to the loan they received to buy the house. Thereafter, the Wiesmuellers' marriage deteriorated, and they began divorce proceedings. In the resulting division of the Wiesmuellers' assets, the state court found that the Wiesmuellers rented the house from the Olivers and awarded use of the property to Mrs. Wiesmueller.

Mr. Wiesmueller now brings this action against Mrs. Wiesmueller and the Olivers under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. Mr. Wiesmueller claims that he was falsely promised ownership of the house and that the defendants committed wire fraud through phone calls, emails, and text messages regarding its

purchase and the Wiesmuellers' move to Tennessee. He seeks an order divesting the defendants of their ownership interest in the house and $67,500.00 in damages, which he calculates to be three times the amount of his anticipated marital share in the house's equity. Mr. Wiesmueller also seeks to hold his wife and in-laws liable under state-law theories of promissory estoppel and intentional infliction of emotional distress.

The defendants have filed motions to dismiss arguing that Mr. Wiesmueller fails to state a RICO claim against them and that the Court should decline to exercise supplemental jurisdiction over his state-law claims. (Doc. Nos. 13, 15, 17.) There is, however, a more fundamental problem with Mr. Wiesmueller's action: the RICO claims he asserts are so transparently an effort to alter the outcome of his divorce proceedings that this Court lacks jurisdiction to adjudicate them. The Magistrate Judge will therefore recommend that Mr. Wiesmueller's RICO claims be dismissed without prejudice for lack of subject-matter jurisdiction; that the Court decline to exercise supplemental jurisdiction over Mr. Wiesmueller's state-law claims; and that the defendants' motions to dismiss be denied as moot.

**I.     Background**

    **A.     Factual History**[1]

In August 2015, the Wiesmuellers hosted the Olivers for a visit in the Wisconsin rental home where they lived with their three children. (Doc. No. 1.) During the visit, the Olivers offered to help the Wiesmuellers buy a house if they moved to Tennessee. (*Id.*) The Wiesmuellers initially

---

[1] Mr. Wiesmueller filed both a redacted version of his complaint for public viewing (Doc. No. 1) and an unredacted and sealed version of his complaint (Doc. No. 3), along with a motion to seal the complaint (Doc. No. 2). The factual history that follows draws primarily from Mr. Wiesmueller's redacted complaint (Doc. No. 1). It also relies on the defendants' motion for sanctions (Doc. No. 34) and Mr. Wiesmueller's response in opposition to it (Doc. No. 38). The Court has discretion to consider other filings like these in determining whether it has jurisdiction, *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947).

declined but, about a year later, realized that they had "neither the credit scores nor the savings to make homeownership a reality" and asked the Olivers if their offer was still open. (*Id.* at PageID# 2.) It was, and, on August 14, 2016, the Olivers purchased a house outside of Burns, Tennessee for the Wiesmueller family to live in. (Doc. No. 1.) The Olivers made a $30,000.00 cash down payment and financed the remainder of the $192,000.00 purchase price with a fifteen-year loan from Regions Bank that they secured with their own house. (*Id.*)

Between August 15 and 22, 2016, the Wiesmuellers and the Olivers communicated via phone, text message, and email regarding the purchase of the house and upcoming move to Tennessee. (*Id.*) The details of these communications are relevant because Mr. Wiesmueller's RICO claims are premised on the theory that some of these communications amounted to wire fraud. On the morning of August 15, 2016, Mrs. Wiesmueller forwarded Mr. Wiesmueller ten pictures of the interior of the house sent by Mrs. Oliver and told him that the Olivers were going to be calling to talk about "a few things mortgage related." (*Id.* at PageID# 3.) Later that day, the Wiesmuellers and the Olivers had a phone conversation in which they discussed the fifteen-year mortgage and the monthly payment of $300. (*Id.*) The next day, Mrs. Wiesmueller sent Mr. Wiesmueller an email summarizing a conversation with Mr. Oliver regarding the move to Tennessee: "Went well on my end . . . you have to remember he was a banker by trade . . . and he said family first, and financial stability is critical . . . . . (regarding owning a home)." (*Id.* (alterations in original).) On August 18, 2016, Mrs. Oliver emailed Mrs. Wiesmueller the following message: "Elizabeth from bank called to say we may be ahead of schedule by almost 2 weeks. Dad said appraiser was at house this morning taking pics. You could be in your new home by September 15th. Now the jobs have to start flowing!!" (*Id.*) Mrs. Wiesmueller forwarded that message to Mr. Wiesmueller with the caption: "OMG. Eek!" (*Id.* at PageID# 4.) On August

22, 2016, Mrs. Wiesmueller forwarded Mr. Wiesmueller three emails from Mrs. Oliver, each containing a picture of the exterior of the house. (*Id.*)

The Wiesmuellers arrived in Tennessee on September 1, 2016, lived with the Olivers for a month, and moved into the Burns house on October 1, 2016. (Doc. No. 1.) For the next ten months, Mr. Wiesmueller stayed home with the children and Mrs. Wiesmueller began a job at which she earned $8,000.00 more annually than she had made in Wisconsin. (*Id.*) During that time, the Olivers did not transfer ownership of the Burns house to the Wiesmuellers, nor did they provide a "rent to own" agreement as Mr. Wiesmueller states he had expected. (*Id.* at PageID# 5.) Each month, through Regions Bank, the Wiesmuellers made payments to the Olivers, who then paid down the mortgage. (*Id.*) On October 13, 2017, Mrs. Oliver sent two emails to the Wiesmuellers and Mr. Oliver with insurance invoices for the house, which was consistent with the understanding that the Wiesmuellers were "to be responsible for the property taxes and insurance." (*Id.*)

After moving into the house, Mrs. Wiesmueller repeatedly rebuffed Mr. Wiesmueller's requests that she obtain a written agreement regarding ownership of the house from her parents, assuring Mr. Wiesmueller that they could "trust family." (*Id.* at PageID# 6.) Mr. Oliver also frequently told Mr. Wiesmueller that, if the Wiesmuellers refinanced the house or paid off the note, they could have the existing equity. (*Id.*) Relying on those representations and text messages from Mrs. Wiesmueller on April 24, 2017, May 4, 2017, and February 20, 2018, in which she referred to the monthly payment that the Wiesmuellers made through Regions Bank as a "mortgage," Mr. Wiesmueller assumed that any increased value in the Burns house would be "marital property" and made "certain improvements to [it] from marital funds, including items ordered online or bought in stores . . . ." (*Id.* at PageID# 5, 6.)

4

In January 2018, the Wiesmuellers' marriage began to collapse, and Mr. Wiesmueller moved in with the Olivers, who "welcomed [him] into their home[ ] as family[.]" (*Id.* at PageID# 7.) On January 31, 2018, after a week with the Olivers, Mr. Wiesmueller expressed to Mrs. Wiesmueller that he wanted to return to the house. (*Id.*) After Mrs. Wiesmueller responded that she was not ready for that, the situation escalated, with Mr. Wiesmueller yelling at his wife that she could not stop him from going home. (*Id.*) Mrs. Oliver intervened, cursing at Mr. Wiesmueller and saying "It's not your house, it's our house, we own it. You can go to the homeless shelter." (*Id.*) The altercation caused Mr. Wiesmueller immediate emotional distress. (Doc. No. 1.)

The Wiesmuellers began divorce proceedings in Tennessee state court in which the house has been "deemed a mere 'rental home,' . . . with Mrs. Wiesmueller retaining use and possession[,]" Mr. Wiesmueller states is evidence of his wife and her parents' intent to defraud him. (*Id.* at PageID# 9.) The state court has also limited Mr. Wiesmueller to supervised visitation with his children. (Doc. No. 35, PageID# 148.) The night before Mr. Wiesmueller filed this lawsuit, he sent Mrs. Wiesmueller an email in which he threatened to sue her and her parents unless she agreed to grant him every other weekend with their children and primary custody. (Doc. No. 35-2, PageID# 161.) Mr. Wiesmueller warned her that this was her "[l]ast chance to conce[de,]" and threatened to "legally take back EVERYTHING [she] took from [him]" through "shock and awe[ ]" legal tactics. (*Id.*) On November 9, 2018, three days after Mr. Wiesmueller filed this action, he wrote Mrs. Wiesmueller an email stating:

> By the way, I offered to settle for my share of the equity in the marital home in summer. I was being kind. That time has long since past [sic]. I will be clear: no blackmail. There will be no settlement. I will take whatever the federal court grants after trial.

(Doc. No. 38, PageID# 181.) Mr. Wiesmueller also wrote that all he wanted "was every other weekend to start with and to talk about equity in the house to help [him] land on [his] feet" and stated his intention to obtain custody of his children "by all legal means necessary." (*Id.*)

### B. Procedural History

Mr. Wiesmueller filed this action on November 6, 2018, naming Mrs. Wiesmueller and the Olivers as defendants. (Doc. No. 1.) He claims that the defendants' communications with him about the house—via email, text, and phone conversations—constituted "a pattern of racketeering activity, specifically, at least two instances of wire fraud" in violation of RICO. (*Id.* at PageID# 9.) Mr. Wiesmueller alleges that, as a result of this fraud, he "was deprived of his marital share of the expected and accrued equity," in the house "in an amount of approximately $22,500." (*Id.* at PageID# 10.) Mr. Wiesmueller seeks three times that amount in damages—$67,500.00—under RICO's treble damages provision. (*Id.*) He also seeks an order requiring the defendants "to divest themselves" of the house. (*Id.*) In the alternative, Mr. Wiesmueller sues the defendants under a theory of promissory estoppel, stating that he relied to his detriment on the Olivers' promise that they would help him and Mrs. Wiesmueller buy a house, and requesting $22,500.00 in damages. (Doc. No. 1.) Finally, Mr. Wiesmueller brings a claim against Mrs. Oliver for intentional infliction of emotional distress based on her statement that the house was not Mr. Wiesmueller's property and that he could go to a homeless shelter rather than return there. (*Id.*) He seeks more than $750,000.00 in damages on this claim. (*Id.*)

On November 29, 2018, each defendant, appearing pro se, filed a motion to dismiss. (Doc. Nos. 13, 15, 17.) They argue that Mr. Wiesmueller has failed to plead the elements of a RICO claim and that the Court should decline to exercise subject-matter jurisdiction over any remaining state-law claims. Because the defendants' arguments are virtually identical, Mr. Wiesmueller filed a single response in opposition. (Doc. No. 19.) After the defendants retained counsel, they filed a

6

motion to amend their motions to dismiss and alternatively, a motion for extension of time to file a reply in support of their motions to dismiss. (Doc. Nos. 28, 29.) Because Mr. Wiesmueller's claims fail on the basis of Court's jurisdiction, no further briefing is necessary. The Court will rule on the parties' cross-motions for sanctions, in which each side accuses the other of harassment and bad faith, at an appropriate time. (Doc. Nos. 34, 43.)

## II. Legal Standard

### A. Subject-Matter Jurisdiction

Federal courts are courts of limited subject-matter jurisdiction and can adjudicate only those claims authorized by the Constitution or an act of Congress. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012). Therefore, whether subject-matter jurisdiction exists is a "threshold" question in any action, *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007), and one that courts may raise sua sponte, *In re Lewis*, 398 F.3d 735, 739 (6th Cir. 2005). This reflects the fundamental principle that "'[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). In a sua sponte analysis of whether there is subject-matter jurisdiction, "the court may inquire by affidavits or otherwise, into the facts as they exist." *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947). The party asserting jurisdiction bears the burden of establishing it. *Ammons v. Ally Fin., Inc.*, 305 F. Supp. 3d 818, 820 (M.D. Tenn. 2018).

### B. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court views the plaintiff's allegations in the light most favorable to him and accepts all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, that statement must allege sufficient facts to show that the claims are "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). To meet it, a plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (alteration omitted) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When a plaintiff brings RICO claims premised on wire fraud, he "must also meet the more rigorous pleading standards of [Federal Rule of Civil Procedure 9(b),]" which provides that, "'[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (second alteration in original) (quoting Fed. R. Civ. P. 9(b)).

Finally, "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

**III.     Analysis**

Mr. Wiesmueller asserts two bases for the Court's subject-matter jurisdiction over this action: 28 U.S.C. § 1331, which provides district courts with federal-question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," and 18 U.S.C. § 1964, which provides jurisdiction over RICO claims. To determine whether federal-question

8

jurisdiction exists under either provision, the Court must apply the well-pleaded complaint rule, which asks whether "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Hudgins Moving & Storage Co. v. Am. Express Co.*, 292 F. Supp. 2d 991, 1002 (M.D. Tenn. 2003) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). While this rule focuses on the plaintiff's allegations, "it allows a court to look past the words of a complaint to determine whether the allegations, no matter how the plaintiff casts them, ultimately involve a federal question." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 475 (6th Cir. 2008). A federal claim that "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction . . ." is insufficient to confer federal subject-matter jurisdiction, as is a claim that is "wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 279 (1977); *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 332 (6th Cir. 2007).

Under a "domestic relations exception," federal courts also lack jurisdiction to entertain a suit seeking "'to modify or interpret an existing divorce, alimony, or child-custody decree.'" *Alexander v. Rosen*, 804 F.3d 1203, 1205 (6th Cir. 2015) (quoting *Chevalier v. Estate of Barnhart*, 803 F.3d 789, 797 (6th Cir. 2015)). Mr. Wiesmueller may not circumvent that rule by "artfully cast[ing]" his complaint to access the federal courts. *Chevalier*, 803 F.3d at 795–96 (6th Cir. 2015) (citing *McLaughlin v. Cotner*, 193 F.3d 410, 414 (6th Cir. 1999)). Therefore, in order to determine whether subject-matter jurisdiction exists, the Court must "sift through the claims of the complaint to determine the true character of the dispute to be adjudicated." *Id.* at 796 (quoting *Firestone v. Cleveland Tr. Co.*, 654 F.2d 1212, 1216 (6th Cir. 1981)). In an action like this one, the "key question is whether the case is 'a core domestic relations case, seeking a declaration of marital or parental status, or a [federal] claim in which it is incidental that the underlying dispute involves a

[domestic relations dispute]." *Johnson v. Collins*, Civil No. 15-31, 2015 WL 4546794, at *3 (E.D. Ky. July 28, 2015) (second alteration in original) (quoting *Catz v. Chalker*, 142 F.3d 279, 291 (6th Cir. 1998), *abrogated on other grounds by Coles v. Granville*, 448 F.3d 853, 859 n.1 (6th Cir. 2006)). In answering that question, the focus is on Mr. Wiesmueller's desired relief; this Court lacks jurisdiction if Mr. Wiesmueller "seeks to modify or interpret the terms of an existing divorce, alimony, or child-custody decree." *Chevalier*, 803 F.3d at 795.

Having reviewed Mr. Wiesmueller's filings, the Court finds that this case falls within the "narrow range" of actions to which the domestic relations exception applies. *Alexander*, 804 F.3d at 1205. Mr. Wiesmueller seeks to modify the order entered in his divorce proceeding that found the house to be a rental property and gave Mrs. Wiesmueller use and possession of it. The relief that Mr. Wiesmueller seeks—an injunction divesting Mrs. Wiesmueller and her parents of the house and a monetary judgment based on Mr. Wiesmueller's alleged marital share of the expected and accrued equity in the property—would effectively nullify that order. Further, calculation of Mr. Wiesmueller's requested damages would require this Court to apply state law to determine his marital share of the accrued equity, which is exactly the kind of endeavor that the domestic relations exception was designed to prevent. *Cf. Alexander*, 804 F.3d at 1206 (holding that the court had jurisdiction to rule on plaintiff's RICO conspiracy claims because resolution of those claims did "not require [the court] to apply Michigan child custody law, question the state's calculation of child support payments, or otherwise address the merits of the underlying dispute"); *see also Stone v. Child Prot. Servs.*, No. 4:16CV-69, 2016 WL 4821371, at *5 (W.D. Ky. Sept. 9, 2016) (concluding that domestic relations exception applied where court "would have to entangle itself in questions of state family law" to resolve plaintiff's claims).

Despite Mr. Wiesmueller's labeling of his claims as such, this is simply not a RICO action. Rather, as his email correspondence with Mrs. Wiesmueller and his complaint make plain, Mr. Wiesmueller has invoked that statute in an effort to secure this Court's jurisdiction to alter the outcome of his divorce. Courts have held that similar attempts do not confer subject-matter jurisdiction. *See Oak Park Tr. & Sav. Bank v. Therkildsen*, 209 F.3d 648, 651 (7th Cir. 2000) (holding that counter-plaintiff's "RICO theory [was] *so* feeble, so transparent an attempt to move a state-law dispute to federal court and avoid the state statute of limitations, that it [did] not arise under federal law at all") (emphasis in original); *Son Ly v. Solin, Inc.*, 910 F. Supp. 2d 22, 28 (D.D.C. 2012) (dismissing RICO claims for lack of subject-matter jurisdiction where the claims presented "at most, a state-law business dispute falling squarely within the jurisdiction of the District of Columbia courts"); *Rendina v. Falco/Rendina/Erickson*, No. CIVA 05 C 7258, 2006 WL 2578926, at *3 (N.D. Ill. Sept. 5, 2006) (finding that RICO claim premised on a conspiracy to prevent the sale of marital property was improperly brought in an effort to invoke federal jurisdiction).

This conclusion is bolstered by the fact that Mr. Wiesmueller's RICO claims also fail on their face as a matter of law. RICO imposes criminal and civil liability on any person who (1) uses income obtained "from a pattern of racketeering activity" to acquire an interest in or operate an enterprise engaged in interstate commerce, 18 U.S.C. § 1962(a); (2) acquires or maintains an interest in or control of an enterprise engaged in interstate commerce "through a pattern of racketeering activity," *id.* § 1962(b); (3) conducts or participates in the conduct of such an enterprise's affairs "through a pattern of racketeering activity," *id.* § 1962(c); or (4) conspires to violate any of the foregoing subsections, *id.* § 1962(d). The existence of a "pattern of racketeering activity" is thus essential to any claim under § 1962. *H.J. Inc.*, 492 U.S. at 232 (explaining that

each activity that § 1962 prohibits includes, "as one necessary element, proof . . . of 'a pattern of racketeering activity' . . .").

Although wire fraud can serve as a predicate act of racketeering activity, Mr. Wiesmueller's complaint offers no plausible foundation for such fraud. *See* 18 U.S.C. § 1961(1)(B) (citing *id.* § 1343). The elements of wire fraud are (1) a scheme to defraud and (2) use of the wires in furtherance of the scheme. *See Heinrich*, 668 F.3d at 404 (citing *United States v. Daniels*, 329 F.3d 480, 486 n.1 (6th Cir. 2003)). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Id.* (quoting *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005)). To establish a scheme to defraud, Mr. Wiesmueller must also allege scienter, "which is satisfied by showing the defendant[s] acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Id.* (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)). The heightened pleading standard of Federal Rule of Civil Procedure 9(b) presents an additional obstacle, requiring Mr. Wiesmueller to "(1) specify the statements that [he] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)); *see also Thomas v. Daneshgari*, 997 F. Supp. 2d 754, 763 (E.D. Mich. 2014) ("Courts rigorously enforce Fed. R. Civ. P. 9(b)'s pleading requirements in RICO cases in which the 'predicate acts' are mail fraud and wire fraud, and have further required specific allegations as to which defendant caused what to be mailed (or made which telephone calls), and when and how each mailing (or telephone call) furthered the fraudulent scheme.").

Mr. Wiesmueller's allegations of wire fraud are inadequate. While his complaint describes a variety of emails, phone calls, and text messages, simply listing the relevant communications does not explain *why* the statements in those communications are fraudulent. *See Heinrich*, 668 F.3d at 404. That is especially so in the absence of a clear description of the nature of the defendants' alleged scheme to defraud him. *See Cranel Inc. v. Pro Image Consultants Grp., LLC*, 57 F. Supp. 3d 838, 849 (S.D. Ohio 2014) (finding that plaintiff corporation had failed to state a RICO claim premised on wire fraud where the allegations of the complaint did not "plausibly establish a scheme to defraud among the Defendants"). Mr. Wiesmueller states that the Olivers offered to help him and Mrs. Wiesmueller buy a house if they moved to Tennessee, that the Wiesmuellers moved to Tennessee and resided in a home that the Olivers purchased, and that the Olivers neither transferred ownership of the house to the Wiesmuellers after they moved nor provided the Wiesmuellers with a rent-to-own agreement. He also alleges that the house being deemed a rental home in his divorce proceedings is evidence of the defendants' intent to defraud him. Liberally construed, Mr. Wiesmueller's complaint suggests a scheme to lure him to Tennessee with a promise of home-ownership and then deprive him of his marital share of the equity in the house.

Such a scheme is entirely implausible. There is no determination regarding marital property in the absence of divorce proceedings. Therefore, a scheme to deprive Mr. Wiesmueller of his marital share of the equity in the house would have to include a scheme to (1) precipitate his divorce from Mrs. Wiesmueller and (2) persuade the state-court judge presiding over the divorce proceedings that the house is not marital property. Mr. Wiesmueller's complaint contains no allegations that would support such a theory and instead portrays the divorce as something the parties sought to avoid. Mr. Wiesmueller also fails to explain why Mrs. Wiesmueller would

participate in a scheme that would deprive her of *her* marital share of the equity in the house.[2] Finally, aside from his conclusory references to the defendants' intent to defraud him, Mr. Wiesmueller has not alleged any facts that would establish scienter or support the inference that (1) the defendants' communications regarding the Burns house were false or misleading and (2) that the defendants knew that to be the case when making them. *See Heinrich*, 668 F.3d at 406.

Mr. Wiesmueller invokes 28 U.S.C. § 1367 as the basis for jurisdiction over his state-law claims. Under that statute, a district court has discretion to decline to exercise supplemental jurisdiction over such claims when it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). Courts exercising that discretion "consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). When all federal claims have been dismissed before trial, these factors usually weigh in favor of dismissing the state-law claims. *Id.* (quoting *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)). There is no reason to depart from that rule here. The Court has not expended significant resources adjudicating this case and Mr. Wiesmueller's state-law claims for promissory estoppel and intentional infliction of emotional distress are better left to the state court system.

## IV. Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that this action be DISMISSED WITHOUT PREJUDICE for lack of subject-matter jurisdiction and that the defendants' motions to dismiss (Doc. Nos. 13, 15, 17) be DENIED AS MOOT.

---

[2] Mr. Wiesmueller states that he does not know when Mrs. Wiesmueller joined the Olivers' conspiracy to defraud him or even what her role was in it. (Doc. No. 19, PageID# 78–79.)

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 17th day of June, 2019.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge